UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OTIS ELEVATOR COMPANY, | : | |
| | : | CIVIL ACTION NO. 3:03cv972 (JCH) |
| *Plaintiff*, | : | |
| | : | |
| VS. | : | |
| | : | |
| GE FANUC AUTOMATION CORPORATION, | : | |
| | : | |
| | : | FEBRUARY 19, 2004 |
| *Defendant.* | : | |

**OTIS ELEVATOR COMPANY'S SUPPLEMENTAL BRIEF IN SUPPORT OF
PETITION TO COMPEL ARBITRATION**

**I.   Preliminary Statement and Background**

Otis Elevator Company ("Otis") submits this supplemental brief in support of its Petition to Compel Arbitration. As described below, Otis believes that there is no longer any dispute between the parties over the facts. For that reason and given the nature of these proceedings, Otis has set forth proposed findings of fact in Exhibit A to this memorandum. Exhibits B and C, respectively, are the deposition transcripts for Robert Gaboury and William Zitelli.

In support of its Petition to Compel Arbitration, Otis Elevator Company ("Otis") submitted the affidavit of Robert Gaboury ("Gaboury Affidavit"). *See* Exhibit 1 to Otis' Aug. 18, 2003 Reply to GE Fanuc's Opposition to Petition to Compel, attached here as Exhibit D. Mr. Gaboury, then an Otis' employee in purchasing, requested that GE Fanuc Automation Corporation ("GE Fanuc") supply engineering services. He dealt principally with William Zitelli, then an account executive in sales for GE Fanuc. Recently, Messrs. Gaboury and Zitelli were deposed. In his deposition, Mr. Zitelli acknowledged that the Gaboury affidavit is entirely accurate. *See* Deposition of William Zitelli ("Zitelli depo.") at 67-69. Indeed, Mr. Zitelli not

only confirmed the content of the Gaboury affidavit, he explained why he did not object to any of the terms and conditions on the purchase order, including the arbitration clause: Mr. Zitelli did not read the terms because he thought that Otis and GE Fanuc had an agreement already in place that would cover these items. *See* Zitelli depo. at 47.

Mr. Zitelli, however, was simply mistaken: there was no other agreement. Mr. Zitelli also testified that, if he had known that there was no other agreement in place, he would have sent the purchase orders to GE Fanuc's in-house lawyers to review. Based on this mistaken belief which he never discussed with Mr. Gaboury, Mr. Zitelli just accepted the purchase orders and fulfilled them according to their terms. Indeed, Mr. Zitelli considered the purchase orders to be the agreement between the parties. *See* Zitelli depo. at 103-04. Consistently, shortly after the tram accident, Mr. Zitelli's boss, Bruce Larkin, wrote to Mr. Gaboury to confirm that the purchase orders set forth the parties' agreement. *See* Larkin letter, attached as Exhibit E. Thus, the parties' objective conduct establishes that the purchase orders control, even if Mr. Zitelli's subjective beliefs were in error. Accordingly, Otis and GE Fanuc agreed to arbitrate.

Disagreements over what happened did emerge for a while. Approximately six months after the accident, GE Fanuc's outside counsel wrote a letter contesting the purchase orders for the first time. Furthermore, GE Fanuc attempted to oppose arbitration based on the notion that the final purchase order had expired at the time of the accident. *See* GE Fanuc's Opp. to Petition to Compel Arbitration. At his deposition, however, Mr. Zitelli confirmed that there were no time limits on the span of the purchase orders, that they were simply estimates for planning. *See* Zitelli depo. at 39-40.

The parties still disagree over the legal effect of what happened. GE Fanuc advocates the notion that the terms and conditions of the final purchase order do not control because the

arbitration clause is a material addition to the supposed oral agreement that the parties entered into in February 2000. The undisputed facts belie this claim. As Mr. Zitelli confirmed in his deposition, the parties discussed a single transaction in February 2000 – the purchase of 480 hours of time from a GE Fanuc employee named Mike Delana at a rate of $76.67 per hour. *See* Zitelli depo. at 71. That arrangement was long over by December 2001, when Mr. Gaboury sent the operative purchase order to requisition more than 1000 hours of straight time at $105 per hour, plus overtime and travel and living expenses for a GE Fanuc employee named Jeff Miller. In the interim, the parties engaged in an undisputed course of conduct in which they used purchase orders – a series of over ten purchase orders – to reflect their agreements. Indeed, Mr. Zitelli explained at his deposition that he, too, needed written purchase orders in order to obtain authorization to send engineers to work on this project. *See* Zitelli depo. at 62-64. The parties' discussions, their course of dealing for over two years, and their objective conduct demonstrate that they set forth their agreements in the many and various purchase orders. In fact, Mr. Zitelli testified that if he were absent, the place that someone would find the parties agreement would be the purchase orders. *See* Zitelli depo. at 103-04. GE Fanuc's desire to pick and choose from among the terms of the purchase order does not spring from any overriding oral agreement, but directly from its desire to avoid some of those terms and conditions, including the agreement to arbitrate. The myth that the parties contract in 2002 was defined by an oral agreement from February 2000 is simply that – a fiction created by GE Fanuc's lawyers to avoid the obligations of the purchase order.

Like the facts, the law weighs heavily in favor of Otis' Petition to Compel. Mr. Zitelli is not the first person who chose not to heed the terms and conditions on the back of purchase orders – despite conspicuous notice on the front of the orders alerting him to those terms and a

-3-

repeated course of conduct of using the purchase orders to document the parties' transactions. Faced with this same fact pattern, courts uniformly enforce arbitration clauses printed on the reverse side of the purchase orders. For example, the Second Circuit required arbitration in these same circumstances in *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F. 2d 7, 8 (2d Cir. 1989), as did the Fourth Circuit in *Stedor Enterprises, Ltd v. Armtex, Inc.*, 947 F. 2d 727, 733 (4th Cir. 1991). Accordingly, this Court should enforce the parties' agreement and grant Otis' Petition to Compel Arbitration.

**II.   Argument**

**THE COURT SHOULD GRANT OTIS'S PETITION TO COMPEL BECAUSE THE PARTIES AGREED TO ARBITRATE IN PURCHASE ORDER K.O. 004783**

The Federal Arbitration Act ("FAA") renders arbitration agreements in contracts involving interstate commerce presumptively "valid, irrevocable and enforceable." 9 U.S.C. § 2. Connecticut law governs the enforceability of the arbitration clause contained in the Otis purchase orders. *See Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-87 (1995); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-944 (1995); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 45-46 (2d Cir. 1993) ("we apply state law in determining whether the parties have agreed to arbitrate") (*citing Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "'The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." *Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) (quoting Restatement (Second), Contracts § 21 (1) (Tent. Dr. 1964) (citation omitted)). In this instance, it is clear from the parties' discussions, the terms of the purchase orders, and the parties' course of conduct that they agreed to the terms and conditions of the purchase orders, including the arbitration clause.

A. **GE Fanuc Accepted The Otis Purchase Orders And In Doing So, Agreed To Arbitrate.**

GE Fanuc's conduct clearly demonstrates that it intended to be bound by the Otis purchase orders. GE Fanuc understood that Otis required the purchase orders to document the parties' agreement, and GE Fanuc wanted this written documentation as well. Otis sent and GE Fanuc received numerous purchase orders, each of which contained the same terms and conditions on the reverse side. The first of these terms provides that the seller accepts the purchase order by supplying any of the items ordered. And while GE Fanuc places great emphasis on the fact that it did not sign the purchase orders, the purchase orders do not require a signature for acceptance, and an agreement to arbitrate need not be signed to be enforceable. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987) (affirming district court's finding that parties agreed to arbitrate with respect to signed and unsigned purchase orders); *Dixie Aluminum Products Co., Inc. v. Mitsubishi Int'l Corp.*, 785 F. Supp. 157, 159 (N.D. Ga. 1992). The acceptance provision located on the back of the purchase orders clearly states "delivery of any of the items ordered" shall constitute "acceptance of this order." In providing the services of Mike Delana and Jeffrey Miller, pursuant to Purchase Order KO. 003347 and its supplements, GE Fanuc accepted those documents as setting forth the parties' agreement. Moreover, by providing Jeffrey Miller's services pursuant to Purchase Order KO. 004783, GE Fanuc delivered the "items ordered," and accepted that purchase order, including the agreement to arbitrate. Indeed, the reason that Mr. Zitelli gave for his failure to sign the purchase orders had nothing to do with any conscious decision on his part not to accept those orders: Zitelli explained that, through the many years he worked for various divisions of General Electric, he

learned that it is GE's policy not to sign and acknowledge purchase orders. *See* Zitelli depo. at 101-102.

By accepting the purchase orders, GE Fanuc accepted them in their entirety, including the terms and conditions on the reverse side. *See Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F. 2d 7, 9 (2d Cir. 1989) (finding that an arbitration agreement appearing on the reverse side of printed confirmation was binding on the parties); *Infinity Indus., Inc. v. Rexall Sundown, Inc.*, 71 F. Supp. 2d 168, 171-72 (E.D.N.Y. 1999) (holding that plaintiff accepted the purchase order in its entirety, including the terms and conditions on the reverse side of the document, because it did not object to the arbitration clause, or any of the other terms and conditions, on the purchase order). For more than two years, GE Fanuc received various purchase orders from Otis, all of which contained the same terms and conditions, including the arbitration clause. Although William Zitelli knew that there were terms and conditions on the reverse side of the purchase order, neither he nor anyone else at GE Fanuc ever objected to either the arbitration clause, or any of the other terms and conditions. *See* Zitelli depo. at 69.

Moreover, GE Fanuc's reason for not objecting to the terms and conditions on the purchase orders is a simple one. Mr. Zitelli, the GE Fanuc employee that entered into the purchase orders with Otis, testified as follows:

> Q. I asked you whether you reviewed the terms and conditions on the back, and you said before you didn't because of the Cimplicity project. Can you explain that?
> A. Generally, when we place someone in a company like POMA-Otis or any large company, the terms and conditions get negotiated separately. And normally, you would get an agreement in place that is signed, and one of the things that is generally in those types of contracts is that whatever is written outside of this type of contract doesn't mean anything, only what is in this paper is - - if you know where I am going with that.
> Q. In the entire agreement?
> A. The agreement is here. Whatever is within purchase orders or whatever,

>    doesn't - - isn't germane to the agreement, so I thought we had that in place already.
> Q. Did you ever see any agreement of that nature that you are describing?
> A. I did not.
> Q. And did anyone ever tell you that there was that type of agreement in place?
> A. They did not.
>
> *****
>
> Q. If you had not believed there was an agreement already in place, what would you have done customarily when you received, say, the first purchase order, Mr. Zitelli?
> A. I would have sent the agreement to our legal department to review it and comment on the terms.
> Q. Was that procedure, sending the agreement to the legal department, something you had done a number of times in your position?
> A. Always. Many times.

*See* Zitelli depo, 47, 49-50.

Mr. Zitelli's misimpression that there was already an agreement in place does not render the terms and conditions of the purchase orders invalid. Indeed, the remedy that GE Fanuc really wants – namely, to reform the purchase orders by omitting certain of the terms and conditions – is not available for unilateral mistake, especially given the absence of any fraud or inequitable conduct on the part of Otis. *See Harlach v. Metropolitan Prop. & Liab. Ins. Co.*, 221 Conn. 185, 190 (1992). Where, as here, a party chooses not to read terms and conditions set forth in numerous purchase orders over an extended period of time, that party cannot avoid those terms and conditions. *See Stedor Enterprises, Ltd. v. Armtex, Inc.*, 947 F. 2d 727, 733 (4th Cir. 1991) (where party seeking to avoid arbitration had received several written confirmations of purchase orders over a six month period, and each confirmation indicated the presence of an arbitration agreement but the purchaser "never looked at those forms but 'simply tossed them in the file,'" the court found that a binding arbitration agreement existed); *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F. 2d 7, 8 (2d Cir. 1989) ("Where, as here, a manufacturer has a well established custom of sending purchase order confirmations containing an arbitration clause, a

-7-

buyer who has made numerous purchases over a period of time, receiving in each instance a standard confirmation form which it either signed and returned or retained without objection, is bound by the arbitration provision."). Not only did Mr. Zitelli review the purchase orders when he received them (*see* Zitelli depo. at 36-37), he was aware that there were terms and conditions on the reverse side of the purchase orders, but consciously decided not to read them. Mr. Zitelli's error cannot render the purchase orders invalid.

### B.   Purchase Order KO. 004783 Did Not Expire On 6/30/02 And Was In Effect At The Time Of The Accident.

On or about December 6, 2001, Mr. Zitelli and Mr. Gaboury entered into Purchase Order KO. 004783, which superceded Purchase Order KO. 003346, its revision and supplements. The Purchase Order was printed and mailed on or about December 7th and received by Mr. Zitelli well in advance of its January 2, 2002 effective date. *See* Zitelli depo. at 41-42. GE Fanuc argues that Purchase Order KO. 003346 "expired" prior to July 22, 2002 and therefore was not in effect at the time of the accident. In making this argument, GE Fanuc places heavy emphasis on the "1/2/02 – 6/30/02" notation on Purchase Order KO. 004783. Despite this notation, the evidence is undisputed that Purchase Order KO. 004783 was an "estimated service length contract" and that June 30th was not a hard and fast due date, and that it did not expire on June 30, 2002. *See* Zitelli depo. at 39-40; *see* Deposition of Robert Gaboury ("Gaboury depo.") at 115.

When Otis and GE Fanuc entered into Purchase Order KO. 004783, both parties anticipated that Otis would need Jeffrey Miller through July 2002. *See* Zitelli depo. at 97. However, Otis did inform GE Fanuc that at some point, it would no longer need Jeff Miller's services. GE Fanuc asked that it be given as much notice as possible, so that it could place Mr.

Miller on a new project, and Otis agreed. *See* Zitelli depo. at 38-39. At the time of the July 22, 2002 accident, Mr. Miller had not exhausted the 1040 hours of straight time and 500 hours of overtime reflected in Purchase Order KO. 004783 and therefore, there was no need to supplement the purchase order. Based on the parties' course of conduct, Mr. Miller would continue to work until the purchase orders were out of money. *See* Gaboury depo. at 115. Because Purchase Order KO. 004783 never ran out of money, it never expired. Indeed, Mr. Miller continued to work under the purchase order into August 2002. GE Fanuc's argument that Purchase Order KO. 004783 had expired is, based on the testimony of its own witness, without merit.

### III.  Conclusion

For the foregoing reasons, Otis respectfully requests that the Court grant its Petition to Compel Arbitration.

PLAINTIFF
OTIS ELEVATOR COMPANY

_____
Daniel L. FitzMaurice (ct05331)
*dlfitzmaurice@dbh.com*
Maureen O'Connor (ct22530)
*moconnor@dbh.com*
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
(860) 275-0100 (telephone)
(860) 275-0343 (facsimile)
Its Attorneys

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was sent on February 19, 2004, via facsimile and U.S. Mail First Class, postage prepaid, to the following:

Charles P. Reed, Esq.
John F. Conway, Esq.
Loughlin Fitzgerald
150 South Main Street
Wallingford, CT  06492

_____
Maureen O'Connor