UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| OTIS ELEVATOR COMPANY, | : |
| *Plaintiff,* | : |
| VS. | : CIVIL ACTION NO. 3:03cv972 (JCH) |
| GE FANUC AUTOMATION CORPORATION, | : |
| *Defendant.* | : August 13, 2003 |

**AFFIDAVIT OF ROBERT W. GABOURY, JR. IN SUPPORT OF PLAINTIFF'S
PETITION TO COMPEL ARBITRATION**

I, Robert W. Gaboury, Jr., being duly sworn hereby depose and say:

1. I am over the age of 18 years and believe in the obligations of an oath.

2. I am a Senior Manager, Global Supply Management at Otis Escalator Systems, an operating unit of Otis Elevator Company ("Otis") and I currently work at corporate headquarters in Farmington, Connecticut. I reside in Wallingford, Connecticut.

**FACTUAL BACKGROUND**

3. Otis is the world's largest manufacturer of elevators, escalators, moving walks and other horizontal transportation systems.

4. I understand that, in 1999, Otis entered into a contract with the Metropolitan Airport Commission to build an Automated People Mover ("APM") at the Minneapolis/St. Paul International Airport.

5. In October 1999, I spoke to Francis Lavine, an employee of GE Fanuc Automation. I had dealt with Mr. Lavine approximately two years earlier in connection with some computer hardware for APM products. In October of 1999, I discussed with Mr. Lavine

Otis' need for assistance with certain programming services connected to the Minneapolis APM project. Mr. Lavine advised me that GE Fanuc Automation Corporation ("GE Fanuc") could provide Otis with programming services for the APM project and gave me the name of a contact person at GE Fanuc, William Zitelli.

6. On or about February 23, 2000, I spoke with William Zitelli regarding programming services in support of the APM project. Mr. Zitelli worked out of GE Fanuc's Bridgeville, Pennsylvania office. Our discussions took place over the telephone, while I was in Farmington, Connecticut and Mr. Zitelli was in Bridgeville, Pennsylvania.

7. On or about February 23, 2000, I informed Mr. Zitelli that any work performed by a GE Fanuc employee would have to be performed pursuant to an Otis purchase order. I also told Mr. Zitelli that Otis would not pay for any labor unless GE Fanuc issued a written invoice listing, among other things, the number of the relevant purchase order.

8. On or about February 23, 2000, Mr. Zitelli and I discussed an arrangement under which GE Fanuc would provide programming services to Otis by supplying a GE Fanuc employee named Mike Dalena. We also agreed that Mr. Dalena's hourly rate would be $76.67 and that he would work for a total number of 480 hours.

9. On or about February 23, 2000, I informed Mr. Zitelli that it would take a few days for a hard copy of the necessary purchase order to be prepared, but that I would fax to him a computer print out of the screen that contained some of the specific information for the APM project, including the purchase order number.

10. On or about February 24, 2000, I faxed to Mr. Zitelli the computer print out of the screen that contained some of the specific information for the APM project, including the

purchase order number of KO. 003346, the hourly rate of $76.67 and the total number of hours to be worked.

11. On February 29, 2000, I mailed to Mr. Zitelli an original Purchase Order KO. 003346. Purchase Order KO. 003346 contains a legend on the bottom of the first page stating **"TERMS AND CONDITIONS ON BACK."** The reverse side of Purchase Order KO. 003346 contains various terms and conditions, some of which I had discussed with Mr. Zitelli during our conversation on February 23, 2000. A true copy of the original Purchase Order KO. 003346 is attached hereto as Exhibit A.

12. At no time did Mr. Zitelli or anyone from GE Fanuc advise me that GE Fanuc objected to any of the terms and conditions of Purchase Order KO. 003346.

13. In approximately April 2000, Mr. Zitelli and I agreed that, because Otis was dissatisfied with the work provided by Mr. Dalena, GE Fanuc would not bill Otis for all of the time logged by Mr. Dalena and that GE Fanuc would supply to Otis a different employee, Jeffrey Miller, to complete the 480 hours of work under Purchase Order KO. 003346. I revised Purchase Order KO. 003346 to reflect these changes.

14. On or about May 22, 2000, I mailed a copy of the revised Purchase Order KO. 003346 to Mr. Zitelli. The revised Purchase Order KO. 003346 contains the same legend on the bottom of the first page and the same terms and conditions on the reverse side as the original purchase order. At no time did Mr. Zitelli or anyone from GE Fanuc advise me that GE Fanuc objected to any of the terms and conditions of the revised Purchase Order KO. 003346. A true copy of revised Purchase Order KO. 003346 is attached hereto as Exhibit B.

15. Mr. Dalena provided programming services to Otis exclusively in Connecticut. Mr. Miller provided programming services to Otis both in Connecticut and Minnesota.

16. GE Fanuc submitted written invoices for labor performed under the revised purchase order which specifically identified Purchase Order KO. 003346 by number.

17. In approximately June 2000, Mr. Zitelli and I agreed that GE Fanuc would provide additional labor by Mr. Miller at an hourly rate of $105.00 and that Otis would pay a set amount for Mr. Miller's travel and lodging. I supplemented Purchase Order KO. 003346 with these terms and mailed the supplemented Purchase Order KO. 003346 to Mr. Zitelli in June 2000.

18. The supplemented Purchase Order KO. 003346 contained the same legend on the bottom of the first page and the same terms and conditions on the reverse side as the original purchase order. At no time did Mr. Zitelli or anyone from GE Fanuc advise me that GE Fanuc objected to any of the terms and conditions of the supplemented Purchase Order KO. 003346.

19. Between June 2000 and October 2001, I prepared several supplements to Purchase Order KO. 003346 to reflect the parties' agreements regarding additional increments of Mr. Miller's programming services. On each occasion, I spoke with Mr. Zitelli in advance of preparing the supplement, obtained his agreement that we would supplement the purchase order, and then mailed the new supplement to Mr. Zitelli. Each supplement to Purchase Order KO. 003346 contains the same legend on the bottom of the first page and the same terms and conditions on the reverse side as the original purchase order. At no time did Mr. Zitelli or anyone from GE Fanuc advise me that GE Fanuc objected to any of the terms and conditions of the supplement to Purchase Order KO. 003346.

20. In all, after revising Purchase Order KO. 003346 in May 2000, we supplemented it nine times. The print dates for the nine supplements were, respectively: June 2, 2000 (supplement 1); July 20, 2000 (supplement 2); August 29, 2000 (supplement 3); September 12,

2000 (supplement 4); October 4, 2000 (supplement 5); January 6, 2001 (supplement 6); January 24, 2001 (supplement 7); February 15, 2001 (supplement 8); and October 5, 2001 (supplement 9). True copies of the supplements to Purchase Order KO. 003346 are attached hereto as Exhibit C.

21. The supplements to Purchase Order KO. 003346 include an entry showing the time period covered. The supplements do not refer to this entry as limiting the term or duration of the supplement, and they did not serve that purpose. These entries were included to provide an estimate for planning purposes. The duration of a supplement was determined by one of two things: either the parties' agreement to change the items covered (the price or quantity of labor specified or the allowance for travel and living expense) or the fulfillment of the amount of labor specified in the supplement. As long as some quantity of labor remained on the existing version, GE Fanuc would continue to supply Mr. Miller's services without the parties supplementing Purchase Order KO. 003346, regardless of whether the time period estimated in the current version of Purchase Order KO. 003346 had expired. For example, Supplement 8 included an entry showing that it covered the period from March 1, 2001 to August 31, 2001. By August 31, 2001, GE Fanuc had not fulfilled the amount of labor specified in Supplement 8. The parties continued to operate under Supplement 8 through the month of September 2001 until the specified amount of services were supplied.

22. On or about October 5, 2001, the parties supplemented Purchase Order KO. 003346 to reflect additional increments of Mr. Miller's programming services that Otis purchased from GE Fanuc  After printing this supplement in early October 2001, I mailed it to Mr. Zitelli. Like the other supplements to Purchase Order KO. 003346, this October 5, 2001 supplement contained the same legend on the bottom of the first page and the same terms and

conditions on the reverse side as the original purchase order. At no time did Mr. Zitelli or anyone from GE Fanuc advise me that GE Fanuc objected to any of the terms and conditions of the October 5, 2001 supplement to Purchase Order KO. 003346. A true copy of Purchase Order KO. 003346, supplemented in October 2001, is attached hereto as Exhibit D.

23. In December of 2001, I received updated information from the Otis electrical engineering manager working on the APM project as to the estimated length of time that Otis would need Mr. Miller's services starting in January 2002. Accordingly, on or about December 6, 2001, I called Bill Zitelli and suggested that we replace Purchase Order KO. 003346 and start a new purchase order for the new year, 2002. I also told Mr. Zitelli that Otis wanted to order 1040 hours of straight time and 500 hours of overtime in the new year. Mr. Zitelli agreed with my suggestion, and I prepared a new purchase order, Purchase Order KO. 004783. As Mr. Zitelli and I discussed, Purchase Order KO. 004783 superceded the ninth and final supplement to Purchase Order KO. 003346 effective January 2, 2002.

24. As in the supplements to Purchase Order KO. 003346, Purchase Order KO. 004783 included an estimate of the term of Mr. Miller's services. Since I understood that Otis would need Mr. Miller's services until at least June 30, 2002, I listed the estimated service length as running from January 2, 2002 to June 30, 2002, and set June 30, 2002 as the "due date." The purchase order does not indicate that this estimate limited the duration of the parties' agreement, nor did I ever discuss with Mr. Zitelli that this or any other estimate of time would serve that function. In late 2001 or in 2002, I did discuss with Mr. Zitelli the fact that, as the project neared completion, Otis would reach the point where it no longer needed Mr. Miller's services. Mr. Zitelli asked that Otis try give advance notice of approximately thirty days so that GE Fanuc could arrange for Mr. Miller's next project.

25. On or about December 7, 2001, I mailed Purchase Order KO. 004783 to Mr. Zitelli. Purchase Order KO. 004783 contains the same legend on the bottom of the first page and the same terms and conditions on the reverse side as Purchase Order KO. 003346, its revision and supplements. At no time did Mr. Zitelli or anyone from GE Fanuc advise me that GE Fanuc objected to any of the terms and conditions of Purchase Order KO. 004783. A true copy of Purchase Order KO. 004783 is attached hereto as Exhibit E.

26. Beginning in January 2002, GE Fanuc submitted written invoices for temporary engineering labor performed under the new purchase order, specifically identifying Purchase Order KO. 004783 by number. A true copy of Invoice 44028480 is attached hereto as Exhibit F.

27. Otis continued work on the project after June 30, 2002, with assistance from GE Fanuc. Since GE Fanuc had not supplied the quantity of labor specified in Purchase Order KO. 004783 as of June 30, 2002, the parties continued under that purchase order without issuing a supplement or new purchase order. As in the past, GE Fanuc submitted an invoice for Mr. Miller's services in the month of July 2002. A true copy of GE Fanuc's Invoice 44030976 is attached hereto as Exhibit G. GE Fanuc included in this invoice services performed by Mr. Miller on July 22, 2002. Upon information and belief, that is the date when he accidentally caused the APM tram to crash into a retaining buffer at the airport terminal.

28. After the accident, I wrote to Mr. Bruce Larkin, Manager, Field Software Support for GE Fanuc. A true copy of my letter of August 12, 2002 is attached hereto as Exhibit H. Among other things, I noted in my letter that "Otis subcontracted with GE Fanuc pursuant to Otis' Purchase Orders KO. 003346 and KO. 004783."

29. By letter dated August 19, 2002, Mr. Larkin responded to my letter of August 12, 2002. A true copy of Mr. Larkin's letter of August 19, 2002 is attached hereto as Exhibit I.

-8-

Among other things, Mr. Larkin stated "in your letter, you refer to the terms of Purchase Orders KO. 003346 and KO. 004783. Please confirm your understanding that these purchase orders govern the relationship between Poma Otis and GE Fanuc." In addition, Mr. Larkin, who was not located in the same office of GE Fanuc as Mr. Zitelli, asked that I forward copies of these purchase orders to him. I responded to Mr. Larkin's request in two letters, dated August 19, 2002 and September 27, 2002, respectively. True copies of these letters are attached hereto as Exhibit J.

      All of the information in the foregoing paragraphs is true and accurate to the best of my belief.

                                                 Robert W. Gaboury, Jr.
                                                 Senior Manager
                                                 Global Supply Management

STATE OF CONNECTICUT       )
                                    ) ss.
COUNTY OF HARTFORD        )

      Subscribed and sworn before me this 13th day of August, 2003.

                                                 Notary Public ERIN E. GRATCHEV
                                                 My Commission Expires: 1-31-07